IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMMETT J. HARRIS, IV, | No. C 11-5306 LHK (PR) |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| JUAN SIMENTAL and G. LOMBARDI, | |
| Defendants. | |

    Plaintiff, a former pretrial detainee proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Defendants Officer Juan Simental ("Officer Simental") and Officer G. Lombardi ("Officer Lombardi") used excessive force against him at the Pittsburg police station. Defendants have filed a motion for summary judgment. Plaintiff has filed an opposition, and Defendants have filed a reply.[1] For the reasons discussed below, the Court GRANTS Defendants' motion for summary judgment.

---

[1] Plaintiff has also filed an opposition to Defendants' reply. Defendants have filed a motion to strike Plaintiff's latest opposition (docket no. 41) on the ground that Plaintiff did not seek permission to file a supplemental pleading, as required by the Northern District of California's Local Rules. Specifically, Civil Local Rule 7-3 provides, in pertinent part, that "once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval." Civ. L.R. 7-3(d). Good cause appearing, Defendants' motion to strike is granted, and the supplemental opposition will be stricken. (Docket No. 44.)

**BACKGROUND**[2]

On November 2, 2009, Plaintiff was a passenger in a vehicle. (Compl. at 3.) At 11:10 p.m., Officer Lombardi noticed that the car had a broken right front headlamp and the driver's side window was tinted, so he stopped the car for a traffic violation. (Decl. Lombardi at ¶ 5; Compl. at 3.) Officer Lombardi made contact with the vehicle's occupants. (Decl. Lombardi at ¶ 6.) The driver and one passenger gave their names, were given verbal warnings, and were released at the scene. (*Id.*) Plaintiff and another male passenger, Horace Harris, did not have identification with them, and gave fake names to the officer. (*Id.* at ¶ 7.) Officer Lombardi ran a warrants check on both Plaintiff and Horace Harris, and could not find a match for their fake names. (*Id.* at ¶ 9.) Eventually, Horace Harris gave his real name and Officer Lombardi learned that Horace Harris had a warrant out for his arrest from the state of Georgia. (*Id.*) Plaintiff still insisted that his name was "John Smith." (*Id.*) Officer Lombardi told Plaintiff that Plaintiff would be detained and brought to the police station for fingerprinting. (Compl. at 3; Decl. Lombardi at ¶ 10.) Horace Harris was also to be taken to the police station for violations of public intoxication and giving false identification to a police officer. (Decl. Lombardi at ¶ 10.) Officer Simental, who had previously arrived on the scene to assist with the traffic stop, handcuffed Plaintiff and transported him to the police station. (*Id.* at ¶¶ 8, 10.)

While in the booking area at the police station, Officer Simental emptied Plaintiff's pockets and placed Plaintiff's personal belongings on the booking counter. (Decl. Simental at ¶ 10.) Officer Simental then removed Plaintiff's handcuffs and directed Plaintiff to remove his "gold teeth," i.e., "grill,"[3] and Plaintiff refused. (Compl. at 3; Decl. Simental at ¶ 11.) Officer Simental told Plaintiff that if Plaintiff did not comply, the grill would be removed with force. (Decl. Simental at ¶ 11.) Plaintiff clenched his teeth in response to prohibit Officer Simental from removing his grill. (Compl. at 3.)

---

[2] The following facts are viewed in the light most favorable to the Plaintiff, and are undisputed unless otherwise indicated.

[3] Plaintiff likens a "grill" to "cheap braces," or a type of jewelry. (Pl. Depo. at 13-14.)

1    As Officer Simental was trying to remove the grill, Plaintiff resisted and grabbed Officer
2 Simental with both hands, shoving Officer Simental backwards. (Decl. Simental at ¶ 13; MSJ,
3 Ex. H at 22:09:10.) Officer Simental asked Community Service Specialist Hardaway ("CSS
4 Hardaway") to call for assistance. (Decl. Simental at ¶ 14; Compl. at 4.) Officer Simental
5 grabbed Plaintiff with both hands to try to control Plaintiff, but Plaintiff resisted and continued to
6 push Officer Simental. (Decl. Simental at ¶ 16.) Plaintiff repeatedly tried to kick Officer
7 Simental. (*Id.*)

8    Officer Lombardi ran into the booking area after being summoned by CSS Hardaway,
9 observed Plaintiff and Officer Simental in a struggle, and believed the situation to be potentially
10 dangerous as Plaintiff's hands were not handcuffed or restrained and could possibly access
11 weapons. (Decl. Lombardi at ¶¶ 15-16.) Officer Lombardi tased Plaintiff using dart mode.
12 (Compl. at 4; Decl. Lombardi at ¶ 17; MSJ, Ex. H at 22:09:28.) Officers were yelling at Plaintiff
13 to turn over. (MSJ, Ex. H at 22:09:32.)

14    At this point, the parties' version of events differ. Defendants allege that after the initial
15 tase, Plaintiff was not sufficiently immobilized. (Decl. Lombardi at ¶ 17.) Defendants allege
16 that Plaintiff continued to resist, tried to get up from the floor, and refused to comply with their
17 commands to turn over onto his stomach and place his hands behind his back. (*Id.* at ¶ 19.)
18 Within 20-25 seconds after the initial tasing, Officer Simental and two other officers – Officer
19 Tamori and Lt. Wentz – were finally able to gain control over Plaintiff and handcuff him. (*Id.* at
20 ¶ 19; Decl. Simental at ¶ 21.) Over the course of that 20-25 seconds, Officer Lombardi
21 discharged his taser three more times – the last two in stun mode. (Decl. Lombardi at ¶ 20.) The
22 last taser discharge occurred approximately 19 seconds from the first taser discharge. (MSJ, Ex.
23 I at 7.)

24    Plaintiff alleges, however, that after the first tase, he was unconscious for about 20
25 seconds. (Compl. at 4.) While Plaintiff was on the ground, fully debilitated, Plaintiff states that
26 Officer Lombardi tased him three additional times. (*Id.*) Plaintiff claims he woke up to blood
27 running down his face, and then was tased again. (*Id.*) Finally, Plaintiff was able to scream,
28 "Stop trying to kill me!", and Officer Lombardi stopped. (*Id.*)

1 Plaintiff does not dispute that after he was handcuffed, Plaintiff continued to be non-compliant with officers' orders to remain quiet. (Decl. Simental at ¶ 22.) Instead, Plaintiff continued to scream and move around, so officers restrained Plaintiff in a full body control device and spit mask. (*Id.*)

Plaintiff received a cut over his right eyebrow during his struggle with Officer Simental. (Decl. Simental at ¶ 23.) Plaintiff refused medical treatment at the scene but was transported to the county hospital by Officer Lombardi. (*Id.* at ¶ 24; Compl. at 4.) Plaintiff has a permanent scar on his face and continues to see spots when he looks out of his right eye. (*Id.*) After being discharged from the hospital, Plaintiff was charged with violating California Penal Code § 69 (violently resisting an executive officer) and § 148.9 (false identification to police officer). Plaintiff pleaded no contest to violating California Penal Code § 69 (MSJ, Ex. C, F) and sentenced to 365 days in county jail. (*Id.*, Ex. C.)

Plaintiff's federal complaint alleges that Officer Simental and Officer Lombardi used excessive force against him by using "excessive tasing" when Plaintiff was already in custody.

## DISCUSSION

I.  Standard of Review

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is

1  entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

2  At the summary judgment stage, the Court must view the evidence in the light most
3  favorable to the nonmoving party: if evidence produced by the moving party conflicts with
4  evidence produced by the nonmoving party, the judge must assume the truth of the evidence set
5  forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152,
6  1158 (9th Cir. 1999).

7  II.     Analysis

8  Defendants argue that: (1) Officer Simental is entitled to judgment as a matter of law
9  because Officer Simental did not use a taser against Plaintiff; (2) Plaintiff's action is barred by
10  *Heck v. Humphrey*, 512 U.S. 477 (1994); (3) there is no genuine issue of material fact in dispute
11  and Defendants are entitled to summary judgment based on the merits and qualified immunity.
12  The Court address each argument in turn.

13  A.      Officer Simental's liability

14  The evidence shows that Officer Lombardi was the individual who deployed the taser
15  against Plaintiff. Liability may be imposed on an individual defendant under 42 U.S.C. § 1983 if
16  the plaintiff can show that the defendant proximately caused the deprivation of a federally
17  protected right. *See Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). A person deprives
18  another of a constitutional right within the meaning of section 1983 if he does an affirmative act,
19  participates in another's affirmative act or omits to perform an act which he is legally required to
20  do, that causes the deprivation of which the plaintiff complains. *See id.* at 633. To defeat
21  summary judgment, sweeping conclusory allegations will not suffice; the plaintiff must instead
22  "set forth specific facts as to each individual defendant's" actions which violated his rights. *Id.*
23  at 634. Even at the pleading stage, "[a] plaintiff must allege facts, not simply conclusions, that
24  show that an individual was personally involved in the deprivation of his civil rights." *Barren v.*
25  *Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

26  Here, viewing the facts in the light most favorable to Plaintiff, Officer Simental was
27  involved in trying to remove Plaintiff's grill as Plaintiff was being booked, when a scuffle
28  ensued between Officer Simental and Plaintiff because Plaintiff refused to take his grill out.

1  Officer Simental called for back-up, and Officer Lombardi came into the booking area where
2  Officer Lombardi proceeded to deploy his taser against Plaintiff.

3        Plaintiff makes no allegations that Officer Simental ever harmed Plaintiff with a taser,
4  much less that Officer Simental was guilty of "excessive tasing." To state a claim under 42
5  U.S.C. § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the
6  Constitution or laws of the United States was violated, and (2) that the alleged deprivation was
7  committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48
8  (1988). Plaintiff has failed to demonstrate that Officer Simental committed any violation against
9  him. Nor has Plaintiff alleged that Officer Simental failed to intervene. Even if Plaintiff had,
10 such a claim would not survive. In order to state an excessive force claim against correctional
11 officer-bystanders, a plaintiff must allege circumstances demonstrating that these officers had an
12 opportunity to intervene and prevent or curtail the violation (e.g., enough time to observe what
13 was happening and intervene to stop it), but failed to do so. *See Robins v. Meecham*, 60 F.3d
14 1436, 1442 (9th Cir. 1995) (prison official's failure to intervene to prevent Eighth Amendment
15 violation may be basis for liability). By all accounts, this incident happened very quickly in a
16 small booking area, so there would not have been time or space for Officer Simental to
17 intervene.

18       Thus, there is an absence of evidence that Officer Simental was responsible for any tasing
19 – excessive or not – against Plaintiff. Accordingly, summary judgment is GRANTED in favor of
20 Officer Simental.

21       B.    *Heck* bar

22       Defendants argue that Plaintiff's criminal conviction for resisting an executive officer,
23 which stemmed from the incident of which Plaintiff complains, requires that the action be
24 dismissed under the rule from *Heck v. Humphrey*, 512 U.S. 477 (1994). *Heck* held that, in order
25 to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other
26 harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a
27 Section 1983 plaintiff must prove that the conviction or sentence has been reversed, otherwise
28 set aside, or called into question. *Id.* at 486-87. Defendants have the burden to prove that

1   Plaintiff's success in this Section 1983 action "would *necessarily* imply or demonstrate that the
2   plaintiff's earlier conviction was invalid." *Smith v. City of Hemet*, 394 F.3d 689, 699 & 699 n.5
3   (9th Cir. 2005) (en banc) (emphasis in original).

4   The Court notes that Plaintiff was charged with willfully preventing Officer Simental
5   from performing a lawful act and resisting Officer Simental's efforts to do the same. (MSJ, Ex.
6   B.) As the Court stated above, and as Defendants argue, Plaintiff's federal excessive force claim
7   does not state a claim against Officer Simental because Officer Simental did not personally
8   discharge the taser. Thus, Plaintiff's excessive force claim would not impact Plaintiff's
9   conviction for resisting an executive officer, in violation of California Penal Code § 69.

10  Further, because the factual support for Plaintiff's federal claim stems from the events
11  that occurred *after* Plaintiff's unlawful behavior – i.e., resisting Officer Simental – it is not clear
12  that Plaintiff's claim would be barred by *Heck*. *See, e.g.*, *Hooper v. County of San Diego*, 629
13  F.3d 1127, 1133-34 (9th Cir. 2011) ("we conclude that a conviction under California Penal Code
14  § 148(a)(1) does not bar a § 1983 claim for excessive force under Heck when the conviction and
15  the § 1983 claim are based on different actions during one continuous transaction") (internal
16  quotation marks omitted)[4]; *Smith*, 394 F.3d at 698 (recognizing that a plaintiff would not be
17  prohibited in filing suit by *Heck* if the allegation is that the excessive force occurred after the
18  conduct upon which plaintiff's conviction was based). Thus, even if Plaintiff could recover
19  damages for his excessive force claim, any damages would be against Officer Lombardi and
20  would not affect Plaintiff's criminal conviction.

21  Because a successful prosecution of this case would not necessarily imply or demonstrate
22  that Plaintiff's criminal conviction under California Penal Code § 69 was invalid, Defendants are
23  not entitled to summary judgment on the basis of *Heck*.

---

[4] Although *Hooper* concerned a conviction under California Penal Code § 148(a)(1) – resisting or obstructing a peace officer, the reasoning of the case leads this Court to doubt that Plaintiff's conviction under California Penal Code § 69 would pose a *Heck* bar to his excessive force claim.

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\LHK\CR.11\Harris306msj.wpd                    7

1  C.  Excessive Force

2  Defendants argue that Officer Lombardi's act of tasing Plaintiff was objectively
3  reasonable, and done with a legitimate governmental purpose. The Due Process Clause protects
4  a pretrial detainee from the use of excessive force that amounts to punishment. *Graham v.*
5  *Connor*, 490 U.S. 386, 395 n.10 (1989). And, "the Fourth Amendment sets the 'applicable
6  constitutional limitations' for considering claims of excessive force during pretrial detention."
7  *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002). The Fourth Amendment's
8  reasonableness standard applies to allegations of use of excessive force against pre-arraignment
9  detainees. *Pierce v. Multnomah County, Oregon*, 76 F.3d 1032, 1042-43 (9th Cir. 1996). In
10  making the determination of whether the force used was reasonable or excessive, the Court
11  balances "'the nature and quality of the intrusion on the individual's Fourth Amendment
12  interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.
13  This means that a Court must "balance the [type and] amount of force applied against the need
14  for that force." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003).

15  The Court finds it helpful to separate the excessive force analysis into two parts: first,
16  whether the initial tasing was reasonable; and second, whether the additional tasing was
17  reasonable.

18  1.  The first taser application

19  Defendants acknowledge that Officer Lombardi discharged the taser, but argue that it was
20  a measured response to Plaintiff, who was violently assaulting Officer Simental. Under the
21  totality of circumstances, and viewing the evidence in the light most favorable to Plaintiff,
22  Officer Lombardi's initial use of the taser was reasonable. Considering the various factors
23  identified by *Graham*, the Court concludes as a matter of law that the force used was not
24  excessive.

25  a.  Nature and quality of intrustion

26  The force used consisted of Officer Lombardi tasing Plaintiff when Officer Lombardi
27  arrived on the scene of the struggle between Plaintiff and Officer Simental. The Ninth Circuit
28  has held that a model X26 taser deployed in dart mode – which is the same kind of model and

mode used by Officer Lombardi (MSJ, Ex. J at 8) – constitutes "an intermediate, significant level of force." *See Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010). "The X26 uses compressed nitrogen to propel a pair of "probes" – aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires – toward the target at a rate of over 160 feet per second. *Id.* Sometimes, the electrical impulse can override one's central nervous system, paralyzing the muscles throughout the body, rendering the individual limp and helpless. *Id.*

The evidence of any injuries to Plaintiff caused by the tasing is minimal. Plaintiff alleges that he has a permanent scar on his face and sees spots out of his right eye, but provides no medical records in support of his assertions that these injuries were caused by the tasing, nor any evidence that the injuries stemmed from any particular Defendant's actions as opposed to Plaintiff's own violent efforts to resist Officer Simental. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (allegations of injury without medical records or other evidence of injury insufficient to establish excessive force claim under Fourth Amendment). However, the Ninth Circuit has noted the general effects of being tased in dart mode. *Bryan*, 630 F.3d at 824-26. These effects include those secondary to the taser's primary effect of discharging electricity to incapacitate the suspect, such as the barbed darts puncturing the suspect's flesh (MSJ, Ex. J at 11) and the taser shock causing the suspect to collapse to the ground, as alleged by Plaintiff.

          b.   Governmental interest in the use of force

The following factors are relevant when evaluating the need for force: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is resisting arrest or trying to evade arrest by flight. *Graham*, 490 U.S. at 396-97. Another relevant consideration is that just because force later appears unnecessary does not mean that it is unreasonable force barred by the Fourth Amendment. The reasonableness is judged from the perspective of a reasonable officer on the scene, not with the 20/20 vision of hindsight. *See id.* Officers often make "split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* Nonetheless, the "most important single element" of the

three factors specified in *Graham* is "whether the suspect poses an immediate threat to the safety of the officers or others." *Smith*, 394 F.3d at 702.

First, at the time Plaintiff was initially tased, plaintiff was not yet charged with any crime. He was taken into the police station for fingerprinting and identification only. However, just before Officer Lombardi responded to Officer Simental's request for back up, Plaintiff was undisputedly resisting a police officer, in violation of California Penal Code § 69, in a very physical manner that placed Officer Simental in harm's way.

Second, the evidence is undisputed that, once Plaintiff was released from his handcuffs and refused to remove the grill from his mouth, Plaintiff engaged in a struggle with Officer Simental to prevent Officer Simental from forcefully removing the grill. The evidence shows Plaintiff shoved Officer Simental and attempted to gain control of Officer Simental. By the time Officer Lombardi arrived at the scene after receiving a request for back-up, Officer Lombardi believed that Plaintiff posed an immediate threat to the safety of the officers. This factor – the most important factor – weighs heavily in Defendants' favor. *See Smith*, 394 F.3d at 702.

Third, the undisputed evidence shows that Plaintiff failed to comply with Officer Simental's instructions to remove the grill, and instead, Plaintiff violently resisted Officer Simental and prevented Officer Simental from performing his lawful duty. (MSJ, Ex. B.) This factor also weighs in Defendants' favor.

The evidence shows that Officer Lombardi did not deploy his taser until he observed Plaintiff's resistant behavior. The Court is mindful that leisurely second-guessing lesser alternatives ignores the directive to analyze the force used, making "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

In weighing all the factors, this Court concludes Officer Lombardi's initial discharge of the taser was reasonable. *See, e.g.*, *Johnson v. Cortes*, No. 09-3946 SI, 2011 WL 445921, at *3, 7 (N.D. Cal. 2011) (weighing *Graham* factors and granting summary judgment on excessive force claim where plaintiff was physically removed from vehicle, struggled with officers, and

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\LHK\CR.11\Harris306msj.wpd
10

officer tased plaintiff). The Court also notes that Plaintiff offers no argument or evidence in opposition to suggest that Officer Lombardi's initial tase was inappropriate or unreasonable. Accordingly, Plaintiff has failed to establish a triable issue of fact as to whether Officer Lombardi's initial taser discharge was excessive, and Officer Lombardi is entitled to summary judgment regarding the application of the initial taser discharge.

### 2. The remaining taser applications

Between the first tasing and the remaining tasings, however, it is less clear whether the evidence is sufficient such that a reasonable jury could not find Officer Lombardi's use of force in tasing Plaintiff a second, third, or fourth time to be unreasonable. The video of the booking station only shows Officer Lombardi enter the scene, draw his taser, and discharge it once he came upon Plaintiff and Officer Simental. Because the struggle moved into a connecting hallway, outside the viewfinder of the video camera, the viewer cannot determine whether Plaintiff was continuing to struggle after he was initially tased, or whether the first taser application was effective.

Officer Lombardi states that he first deployed the taser in dart mode and struck Plaintiff in the upper right side of Plaintiff's torso. (Decl. Lombardi at ¶ 17.) Although Plaintiff fell to the ground, Officer Lombardi felt the taser darts were too close together to sufficiently immobilize Plaintiff. (*Id.*) Thereafter, Officer Lombardi discharged the taser in "drive stun" mode an additional two times.[5] (*Id.* at ¶ 20.) All four taser applications occurred within 19 seconds of each other. (*Id.*)

Taking the evidence in the light most favorable to Plaintiff, however, Plaintiff states that

---

[5] The Ninth Circuit has not specifically categorized the nature and quality of the intrusion at issue when a taser is used in the "drive stun" mode, which is apparently a lower setting or lesser application of the taser than the "dart mode." *See Mattos*, 661 F.3d at 443 ("When a taser is used in drive stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode."). In viewing the facts in the light most favorable to Plaintiff, the Court shall assume that the taser use in drive stun mode constituted a somewhat less than intermediate level of force.

1  after the first taser application, Plaintiff was debilitated and helplessly lying on the ground.  The
2  Court notes, however, that in the recorded video of this incident, Plaintiff can be heard
3  screaming through the 20-25 seconds following the initial taser deployment, and officers can be
4  heard yelling at Plaintiff to "turn over."  (MSJ, Ex. H, 22:09:28-50.)  Nonetheless, in this case,
5  Officer Lombardi could be found to have acted unreasonably in the second, third, and fourth
6  tasings because he used an intermediate level of force even though Plaintiff did not appear to
7  pose an immediate threat to the safety of officers or others and was not actively resisting
8  compliance with officers.

9  Defendants argue that, even if the force used by Officer Lombardi was excessive, he is
10 protected by qualified immunity.  The defense of qualified immunity protects "government
11 officials . . . from liability for civil damages insofar as their conduct does not violate clearly
12 established statutory or constitutional rights of which a reasonable person would have known."
13 *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court considering a claim of qualified
14 immunity must determine: (1) whether the plaintiff has alleged the deprivation of an actual
15 constitutional right, and (2) whether such right was clearly established such that it would be clear
16 to a reasonable officer that his conduct was unlawful in the situation he confronted.  *See Pearson*
17 *v. Callahan*, 129 S. Ct. 808, 818 (2009).  The Court may exercise its discretion in deciding
18 which prong to address first, in light of the particular circumstances of each case.  *Id.*

19 Qualified immunity applies if the unlawfulness of the officers' use of force was not
20 clearly established at the time of the challenged incident.  *See Saucier v. Katz*, 533 U.S. 194, 202
21 (2001).  A court determining whether a right was clearly established looks to "Supreme Court
22 and Ninth Circuit law existing at the time of the alleged act."  *Community House, Inc. v. Bieter*,
23 623 F.3d 945, 967 (9th Cir. 2010).  A law is clearly established where "it would be clear to a
24 reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533
25 U.S. at 202.  In the context of an excessive force claim, "An officer might correctly perceive all
26 of the relevant facts but have a mistaken understanding as to whether a particular amount of
27 force is legal in those circumstances.  If the officer's mistake as to what the law requires is
28 reasonable, however, the officer is entitled to the immunity defense."  *Id.* at 205.

As an initial matter, Plaintiff does not address the issue of qualified immunity at all, and therefore, fails to meet his burden to show that the law regarding the use of tasers was clearly established on November 2, 2009, the date of the challenged incident. Hence, the Court finds that even if Plaintiff has sufficiently alleged the deprivation of a constitutional right, Officer Lombardi is entitled to qualified immunity because the law regarding multiple, quick applications of a taser, after a first application that was objectively reasonable, was not then clearly established.

The Ninth Circuit decided in *Bryan* in 2010, and *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc), soon after. Both of the cases provide the most extensive and recent guidance on tasers as a use of force.

In *Bryan*, the plaintiff was pulled over for a seatbelt violation. *Bryan*, 630 F.3d at 822. The plaintiff was agitated, but did not verbally threaten the officer or attempt to flee. *Id.* Plaintiff was approximately 20-25 feet away from the officer and the evidence was disputed whether plaintiff took "one step" toward the officer. *Id.* In fact, the evidence suggested that plaintiff was actually facing away from the officer. *Id.* Without warning, the officer shot plaintiff with his taser gun. *Id.* Plaintiff fell face first, fractured four teeth, and suffered facial contusions. *Id.* The Ninth Circuit found that the officer used excessive force, but granted him summary judgment based on qualified immunity. *Id.* at 832. The Court held that, while a reasonable officer would have known that, in those circumstances, it was unreasonable to deploy intermediate force, there was no Supreme Court or circuit law addressing whether the use of a taser in dart mode was an intermediate level of force. *See id*. at 832-33. Thus, ruled the Ninth Circuit, the officer could have made a reasonable mistake of law regarding the constitutionality of the taser in those circumstances in July 2005.

In *Mattos*, the Ninth Circuit addressed two cases: *Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010), and *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010). With respect to *Brooks*, the plaintiff was a woman, seven-months pregnant, who was pulled over in 2004 for speeding, and refused to sign the traffic citation. *Mattos*, 661 F.3d at 436-37. Plaintiff and the officer "exchanged heated words," and the officer threatened plaintiff that if she failed to sign the

G:\PRO-SE\LHK\CR.11\Harris306msj.wpd          13

citation, she would go to jail. *Id.* at 437. After some time, another officer showed up, and told plaintiff to get out of the car because she was going to jail. *Id.* The plaintiff refused. The officers attempted to remove plaintiff from her car. *Id.* When she stiffened, one officer drew his taser and showed plaintiff what it did. *Id.* One officer was able to hold plaintiff's arm behind her back, and tased plaintiff's left thigh in drive-stun mode. *Id.* Thirty-six seconds later, plaintiff was tased again, and six seconds after that, plaintiff was tased again. *Id.* Again, the Ninth Circuit found that the officers used excessive force on plaintiff, but, relying on *Bryan*, concluded that the law on the use of tasers was not sufficiently clear to render the violation as clearly established. *Id.* at 448.

With respect to the plaintiff in *Mattos*, the Ninth Circuit concluded that, in 2006, the officers used excessive force. But, the Ninth Circuit concluded, again, that the law was not clearly established when the plaintiff was tased in dart mode even though plaintiff posed no threat to the officers, plaintiff minimally resisted the officers' attempt to arrest plaintiff's partner, and plaintiff attempted to comply with the officers' request to speak with plaintiff outside. *Mattos*, 661 F.3d at 450-52.

Here, applying the reasoning in *Bryan* and *Mattos*, a reasonable officer would not have known as of November 2, 2009, that the use of a taser four times in Plaintiff's situation within 20 seconds would be unconstitutional. This Court has not found a case under the circumstances present here demonstrating that the question was "beyond debate" on or around November 2, 2009. Only upon the Ninth Circuit Court of Appeals' publication of its opinions in *Bryan v. MacPherson*, in 2010, and *Mattos v. Agarano*, in 2011, did the law regarding the use of tasers – and the distinctions between their use in the drive stun and dart modes – begin to gain some clarity, albeit in factual scenarios distinguishable from the facts here. Thus, the law regarding taser use was not clearly established in November 2009.

Additionally, the Ninth Circuit and its district courts have concluded that the law regarding taser usage was not clearly established around the date of the incident underlying this case. *See, e.g.*, *Abston v. City of Merced*, No. 11-16500, 2013 WL 354214, at ** 3 (9th Cir. Jan. 31, 2013) (unpublished memorandum disposition) (as of February 2008, "it was not clearly

established at the time of [plaintiff's] arrest that use of four, five-second Taser cycles within a span of approximately two minutes against a suspect who appeared unarmed, fell to the ground following the first tasing and thereafter presented no real threat of escape, and was surrounded by three officers, was objectively unreasonable"); *Sanchez v. Kimmins*, No. 10-15985, 2012 WL 562596, at *1 (9th Cir. Feb. 22, 2012) (unpublished memorandum disposition) (holding that, as of May 14, 2006, "a reasonable officer would not have known that using a taser [three times] to induce compliance from an individual who appeared to pose an immediate threat and who was not under the officer's control violated the Fourth Amendment's prohibition on excessive force"); *De Contreras v. City of Rialto*, 894 F. Supp. 2d 1238, 1255-56 (C.D. Cal. Sept. 25, 2012) (recognizing that there has been little clarification on the law regarding multiple tasings, and granting qualified immunity when in 2010, it was "not clearly established how firing a taser at a threatening suspect affects the degree of threat that every reasonable officer would perceive after that first tasing"); *Pryor v. City of Clearlake*, 877 F. Supp. 2d 929, 947-48 (N.D. Cal. July 6, 2012) (relying on *Bryan*, and granting qualified immunity to officer when, on September 30, 2009, officer tased plaintiff, and when plaintiff was on the ground, having been shot, and was bleeding, officer tased plaintiff a second time for failing to comply with orders to roll onto his stomach); *Wise v. Kootenai County, Idaho*, No. 2:11-cv-00472-CWD, 2013 WL 1789716, at *8-9 (D. Id. April 26, 2013) (unpublished) (granting qualified immunity to officer when facts, taken in light most favorable to plaintiff, showed that in October 2009, after officer "deployed his taser in dart mode, Plaintiff was incapacitated, he no longer posed a threat to the Deputies, and he was no longer resisting arrest," officer applied taser to plaintiff several more times).

Because the law was not clearly established that a reasonable law enforcement officer could have believed that multiple applications of a taser under these circumstances did not violate any clearly established constitutional law, this Court finds that Officer Lombardi is entitled to qualified immunity.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. The Clerk shall terminate all pending motions and close the file.

IT IS SO ORDERED.

Dated: 7/15/13

_____
LUCY H. KOH
United States District Judge